**ROCKWELL GRAPHIC SYSTEMS, INCORPORATED, Plaintiff– Appellant,**

v.

**DEV INDUSTRIES, INCORPORATED, Press Machinery Corporation, and Robert J. Fleck, Defendants.**

**ROCKWELL GRAPHIC SYSTEMS, INCORPORATED, Plaintiff– Appellant,**

v.

**DEV INDUSTRIES, INCORPORATED, Press Machinery Corporation, Robert J. Fleck, Toshio Yamagata, Michael Schwartz, and Randall Coakley, Jr., Defendants.**

**Toshio Yamagata and Tensor Group, Incorporated, Appellees.\***

Nos. 95–1280, 95–1351.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 6, 1996.

Decided July 30, 1996.

---

\* The appellant asserted claims for relief based upon two injunctions entered by the district court in these civil actions. Neither injunction named the appellees as enjoined parties (Yamagata was named in the second injunction only as an officer of DEV), but the appellant's claims are premised upon the appellees' active concert or participation with those named in the injunctions. The appellees did not contest the district court's exercise of personal jurisdiction. Accordingly, we view this matter as part of the original civil actions over which the district court maintains jurisdiction to modify or enforce the injunctions. See *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); *Leman v. Krentler–Arnold Hinge Last Co.,* 284 U.S. 448, 452–53, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932).

Wayne L. Tang, Jeanne M. Gills, Scott R. Lasser, Tracy E. Donner, Keck, Mahin & Cate, Chicago, IL, Michael O. Warnecke (argued), Deborah S. Ruff, Richard A. Speer, Mayer, Brown & Platt, Chicago, IL, Sharon R. Barner, Foley & Lardner, Chicago, IL, for Rockwell Graphic Systems, Inc. in No. 95–1280.

Steven L. Baron, James K. Meguerian (argued), D'Ancona & Pflaum, Chicago, IL, for Toshio Yamagata.

John W. Costello, John S. Letchinger (argued), Wildman, Harrold, Allen & Dixon, Chicago, IL, for Tensor Group, Inc. in No. 95–1280.

Scott R. Lassar, Wayne L. Tang, Jeanne M. Gills, Tracy E. Donner, Keck, Mahin & Cate, Chicago, IL, Michael O. Warnecke (argued), Deborah S. Ruff, Richard A. Speer, Mayer, Brown & Platt, Chicago, IL, Sharon R. Barner, Foley & Lardner, Chicago, IL, for Rockwell Graphic Systems, Inc. in No. 95–1351.

Craig S. Fochler, John W. Costello, John S. Letchinger (argued), Wildman, Harrold, Allen & Dixon, Chicago, IL, for Tensor Group, Inc. in No. 95–1351.

Before ESCHBACH, KANNE, and EVANS, Circuit Judges.

KANNE, Circuit Judge.

This protracted litigation, which involves two separate though related lawsuits, has occupied the resources of the district court since 1984. At the conclusion of each of the two proceedings, the district court issued an injunction prohibiting the named parties from engaging in a variety of acts involving trade secret information misappropriated from the plaintiff, Rockwell Graphic Systems, Inc.

Rockwell moved for a rule to show cause why appellees Toshio Yamagata and Tensor Group, Inc., should not be held in contempt for violating the injunctions. The district court invited limited briefing by the con-

cerned parties and received affidavits and other materials in support of and in opposition to Rockwell's motion. Rockwell's motion was subsequently denied without an evidentiary hearing.

Rockwell appeals and assigns several points of error by the district court, only one of which we address in deciding this appeal. While acknowledging the district court's monumental efforts handling the many facets of this longstanding dispute, we are forced to conclude that the district court failed to resolve several genuine issues of material fact that were both relevant and necessary to an informed disposition of Rockwell's motion. We accordingly must vacate the district court's order denying Rockwell's motion for a rule to show cause and remand this matter for further proceedings.

## I

The facts of this case are somewhat complex and, on several relevant points, disputed by the parties. In summary, the record demonstrates that DEV Industries, Inc., misappropriated trade secret information belonging to Rockwell. Rockwell's subsequent efforts to seek relief in federal court led to the eventual bankruptcy and liquidation of DEV, of which Yamagata was then president. At approximately the same time, Yamagata became involved with Tensor, which purchased many of DEV's assets at a bankruptcy auction in August 1993. It is the events surrounding Tensor's formation and subsequent production of its D–1400 and D–2400 printing presses that form the heart of this matter. When appropriate, we rely upon the district court's findings of fact concomitant to its entry of the injunctions and its denial of Rockwell's motion.

## A

Rockwell designs, manufactures, sells, and maintains printing equipment used by commercial printing and publishing businesses worldwide. Rockwell has accumulated a significant amount of proprietary trade secret information relating to the design and manufacture of its commercial printing equipment and has expended considerable resources to develop and maintain this information. Rockwell's competitive position would be significantly harmed should one of its competitors obtain this trade secret information, and Rockwell has accordingly taken substantial measures to maintain the secrecy of its trade secrets.

DEV began to compete with Rockwell in 1984 with its introduction of the Horizon models 1400 and 2400 printing presses. Yamagata was the president and a director of DEV, and he participated in the development and manufacture of the Horizon presses. Yamagata was also the business partner of Martin Hozjan; they held joint ownership of MAH Industries, which assembled the DEV Horizon 1200 and 2400 presses. Hozjan also held an ownership interest in MAH Machine Company,[1] which supplied parts for the DEV presses. DEV remained in business until June 30, 1993, when it made a common law assignment for the benefit of creditors, and it subsequently liquidated its assets pursuant to chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.*

Prior to DEV's demise, Hozjan incorporated Tensor on July 1, 1993. There is some disagreement over the extent of Yamagata's involvement with Tensor. Yamagata denies that he was permanently employed by Tensor. He also claims no pecuniary interest in Tensor beyond his equity in MAH Industries, which stood to benefit from Tensor's eventual production of its models D–1400 and D–2400 printing presses following its purchase of DEV's assets. The district court found that Tensor was Yamagata's brainchild and that Yamagata conceived Tensor in order to purchase DEV's assets and to continue marketing the Horizon 1400 and 2400 presses under different labels. It appears undisputed that Yamagata was instrumental in the development and implementation of Tensor's business plan.

Rockwell filed the first lawsuit on August 6, 1984, against DEV, Press Machinery Cor-

1. There is a discrepancy in the record concerning the proper name of the MAH entity that provided parts for the DEV presses; the district court uses "MAH Machine Company" and Rockwell uses "MAH Machinery."

poration, Robert J. Fleck, and Pat Peloso,[2] alleging misappropriation of trade secrets contained in Rockwell's engineering drawings of parts contained in two of its printing presses ("DEV I"). After winding its way through discovery, summary judgment, and reversal of that summary judgment by this court, *Rockwell Graphic Systems, Inc. v. DEV Indus., Inc.,* 925 F.2d 174 (7th Cir. 1991), the case was finally decided by a jury in Rockwell's favor on December 22, 1992. Prior to the jury's verdict in DEV I, Rockwell filed a second lawsuit against DEV and four of its officers, including Yamagata, on August 24, 1992 ("DEV II"). Rockwell filed this second lawsuit based upon information it learned during discovery in DEV I concerning DEV's misappropriation of trade secret information beyond that involved in DEV I. The parties reached an agreement to settle DEV II in May 1994.

Following the jury's verdict in DEV I, Rockwell moved for an injunction prohibiting an array of activities stemming from DEV's misappropriation of Rockwell trade secrets. Prior to the district court's decision on Rockwell's motion, DEV made its assignment for the benefit of creditors on June 30, 1993. Hozjan incorporated Tensor the next day, and Tensor submitted an offer to the assignee to purchase DEV's technical drawings of its presses, excluding those drawings either found to contain misappropriated trade secret information in DEV I or alleged to contain misappropriated trade secret information in DEV II.

On August 2, 1993, six of DEV's creditors filed an involuntary petition against DEV under 11 U.S.C. § 303(b), seeking liquidation of DEV's assets. The bankruptcy judge authorized the sale of certain DEV assets at an auction to be held on August 17, 1993. Among the assets to be sold were the drawings previously bid upon by Tensor. At the auction, Tensor acquired DEV's parts drawings, parts inventory, press assembly drawings, and other assets including DEV's corporate name. The district court appointed a bankruptcy trustee on August 19, 1993, and the trustee subsequently facilitated the return to Rockwell of the drawings at issue in DEV I, none of which were included in the drawings sold to Tensor at the auction. In the meantime, the parties were nearing the settlement of DEV II, and the drawings at issue in DEV II were delivered to Rockwell by the trustee on May 19, 1994.

Following its purchase of DEV's assets, Tensor moved to fill the void created by DEV's extinction. It hired approximately fifteen former DEV employees, including Dan Kosrow, an engineer whom Tensor designated to head its own engineering department. Tensor also solicited DEV's customers, committing itself to service and support for DEV presses. Tensor engaged the services of Castle Engineering to reverse engineer[3] printing presses comparable to the DEV presses, and Castle Engineering purportedly reverse engineered a press comparable to the Horizon 1400 in only one month.[4] Beginning around October 1993, Tensor began offering for sale printing presses that Rockwell claims were duplicates of the Horizon 1400 and 2400 presses formerly manufactured by DEV. The district court found that the pictures accompanying the specifications for these Tensor presses were in fact altered photos of the DEV Horizon 1400 and 2400 presses.

### B

The district court entered permanent injunctions in DEV I and DEV II on July 28, 1993, and May 19, 1994, respectively.[5] The DEV I injunction applies to DEV and Fleck, as well as to "their officers, directors[,] em-

---

2. Peloso was dismissed as a defendant pursuant to a consent decree entered in September 1988.

3. Reverse engineering is a method of industrial engineering in which one begins with a known finished product and works backward to divine the processes and specifications involved in the product's development and manufacture. *See Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974).

4. There was undisputed evidence presented in the DEV I trial that reverse engineering a commercial printing press similar to the Horizon 1400 would take approximately eight years.

5. When appropriate, we refer to the DEV I and DEV II injunctions collectively as "the injunctions."

ployees[,] and agents; their predecessors or successors in interest or assigns; and to all other persons or entities in active concert or participation with the parties who have actual notice of this injunction." The DEV II injunction applies to "DEV, any employees or agents; any predecessors or successors in interest or assigns; and to all other persons or entities in active concert or participation with DEV who have actual notice of this injunction." Both injunctions are to remain in force for a period of eight years.[6]

The injunctions' proscriptions are nearly identical, and the discrepancies are immaterial to the resolution of this appeal. The injunctions prohibit, among other things, the reproduction, acquisition, disclosure, or utilization of any document that contains misappropriated Rockwell trade secret information or the fruits of such information. They also prohibit the development, manufacture, or marketing of any equipment embodying manufacturing information or specifications obtained or derived from Rockwell trade secret information. The injunctions prohibit the defendants from contacting Rockwell's employees, ex-employees, contractual privies, or those in relationships of trust and confidence with Rockwell for the purpose of facilitating the misappropriation of Rockwell trade secret information. The DEV I injunction also requires the named parties to return to Rockwell all documents, drawings, dies, castings, equipment, or other material containing or derived from misappropriated Rockwell trade secret information. It also directs the defendants to use their best efforts to obtain the return of all such material in the possession, custody, or control of third parties not otherwise covered by the terms of the injunctions. The DEV II injunction contains similar language directed at the DEV bankruptcy trustee.

On July 1, 1994, Rockwell filed its motion for a rule to show cause why Yamagata and Tensor should not be held in contempt. It alleged that Tensor was bound by the terms of the injunctions because it was in privity with DEV by virtue of its purchase of all of DEV's drawings and inventory not covered by the injunctions, its purchase of DEV's customer lists, and its assumption of DEV's obligations under warranties attending prior press installations and under contracts to complete ongoing installations.

Rockwell also alleged in its motion that an analysis of the Tensor drawings used to design its presses reveals that fourteen DEV drawings adjudged to contain misappropriated trade secret information in DEV I and DEV II were used to produce parts for the Tensor presses. Rockwell submitted an exhibit comparing these fourteen DEV drawings with their alleged Tensor counterpart, and it alleges numerous instances of misappropriation based upon this comparison. In sum, Rockwell suggests that Tensor was able to design and produce the presses in so short a time period precisely because it was using Rockwell trade secret data.

So how did Tensor acquire this data? After all, the resolution of DEV I and DEV II was supposed to have included the return of all drawings containing, or substantially derived from, Rockwell trade secret information. According to Rockwell, Yamagata's actions are the key to the puzzle. From December 1992 until sometime prior to July 1993, Yamagata arranged for the duplication of between 2,000 and 3,000 DEV drawings on microfilm, including the drawings containing Rockwell trade secrets. Rockwell states that Yamagata retained this microfilm in a safety deposit box in violation of the DEV I injunction, which required the return of all copies of tainted DEV drawings by August 28, 1993. Yamagata eventually turned the microfilm over to Rockwell at a deposition on December 22, 1993, after Rockwell had learned of its existence. At that deposition, Yamagata admitted to possessing this film and also stated that the safety deposit box was registered to him personally. Rockwell asserts that the improbable similarities between the Tensor specifications and the misappropriated trade secret information contained in the DEV drawings lead to only one reasonable conclusion: Yamagata provided Tensor with the microfilmed DEV drawings, and Tensor

---

**6.** The DEV I injunction was originally styled to run for two years, but the district court subsequently modified it to have a lifespan of eight years.

used the drawings in designing its D–1400 and D–2400 printing presses.

After Rockwell filed its show cause motion, the district court directed the parties to focus only on the issue of whether Yamagata and/or Tensor were in privity with DEV and thereby bound by the injunctions, and not on the issue of whether their conduct amounted to violations of the injunctions. The district court ultimately concluded that Tensor and Yamagata were not in privity with DEV, and, thus, that they could not be held in contempt for violations of the injunctions.[7]

Rockwell argues on appeal that the district court committed reversible error as a matter of law in failing to find Tensor and Yamagata bound by the injunctions. Rockwell also argues that because there are disputed issues of critical fact pertaining to whether Tensor had surreptitiously acquired and continued to use Rockwell trade secrets that were the subject of the injunctions, the district court denied it due process of law by not holding an evidentiary hearing.

## II

### A

The district court issued the injunctions in accordance with Rule 65(d) of the Federal Rules of Civil Procedure, which prescribes the form and scope of injunctions:

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

FED. R. CIV. P. 65(d). The Supreme Court has explained that the last clause of Rule

65(d) "is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945).

■■■ The interpretation of "active concert or participation" has engendered two lines of cases in which parties not named in an injunction are bound thereby. First, an injunction may bind nonparties who are successors in interest to parties named in the injunction with respect to the subject matter of the injunction. *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 179–80, 94 S.Ct. 414, 422–23, 38 L.Ed.2d 388 (1973); *Herrlein v. Kanakis*, 526 F.2d 252, 253–54 (7th Cir. 1975); *Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335, 339 (7th Cir.1969). Second, parties otherwise without an injunction's coverage may subject themselves to its proscriptions should they aid or abet the named parties in a concerted attempt to subvert those proscriptions. *Regal Knitwear*, 324 U.S. at 14, 65 S.Ct. at 481; *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–37, 54 S.Ct. 475, 477 (1934); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir.1930). For more recent applications of this rule, see *Northeast Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1355–56 (3d Cir.), *cert. denied*, 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989); *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986); *G & C Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 34–35 (1st Cir.1980); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 129–30 (2d Cir.1979); *In re Public Serv. Co. of New Hampshire*, 848 F.Supp. 318, 327 (D.R.I.1994), *aff'd*, 43 F.3d 763 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 850 (1995). These rules may also apply in somewhat hybrid fashion in a case where a successor corporation is formed essentially for the purpose of carry-

---

7. In requesting a finding of contempt, Rockwell asked for modification of the DEV I and DEV II injunctions to prohibit Tensor and Yamagata (1) from using the misappropriated trade secret information contained in the DEV drawings and

(2) from producing either the D–1400 or D–2400 printing press for a period of eight years. Because it denied Rockwell's show cause motion, the district court did not address Rockwell's request for modification of the injunctions.

ing on the enjoined activity. *Cf. Panther Pumps & Equip. v. Hydrocraft, Inc.*, 566 F.2d 8, 24–25 (7th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978).

■ These constructions of the "active concert or participation" language of Rule 65(d) recognize that the objectives of an injunction may be thwarted by the conduct of parties not specifically named in its text. The scope of an injunction has no rigid perimeter, and a court may modify an injunction to adapt to changed circumstances. *Swift & Co.*, 286 U.S. at 114–15, 52 S.Ct. at 462. Even absent such modification, however, a nonparty's actions may render it susceptible to the injunction's effect. Thus, as the cases cited above illustrate, the reach of an injunction will accord with its purpose(s), subject to the limitations of due process. A court must consider the extent of the alleged "active concert or participation" of third parties with those named in the injunction in determining whether the injunction's prohibitions shall apply to those third parties.

### B

It is this last point that forms the basis for our disagreement with the approach taken by the district court. To attempt a divorce of the inextricable questions of whether Yamagata and/or Tensor are bound by the injunctions and of whether their conduct may have violated the injunctions seems ill suited to the complex facts of this particular case. The resolution of Rockwell's allegations made in support of a finding of contempt necessitated a complete factual inquiry.

■ Civil contempt proceedings are part of the action from which they stem, and their purpose, of course, is to secure compliance with a prior court order. *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993). A district court has considerable latitude in how it goes about enforcing its own decrees in a contempt proceeding. *Id.* However, it is beyond question that in a civil contempt proceeding, a party against whom contempt is sought is entitled to have the district court resolve relevant factual disputes. *Id.; In re Grand Jury Proceedings*,

894 F.2d 881, 882–83 (7th Cir.1989). There is no reason to suppose that this due process protection accrues only to the benefit of those alleged to be in contempt. A party who seeks enforcement of an injunction through the medium of civil contempt is likewise entitled to the resolution of genuine issues of material fact that bear upon the allegations by which it seeks to support a finding of contempt.

The following are three such factual allegations that were left unsolved by the district court: (1) Yamagata's retention of tainted DEV drawings and defiance of the DEV I injunction's directive that all such drawings be turned over to Rockwell; (2) Yamagata's provision of these drawings to Tensor; and (3) Tensor's use of the tainted DEV drawings in its own design drawings for its printing presses. These are the type of acts that Rockwell claims were contrary to the injunctive provisions and that might tend to show "active concert or participation" by Yamagata and Tensor, which would bring them within the ambit of the injunctions.

■ The district court's method of disposing of Rockwell's motion—limiting the privity inquiry—foreclosed an adequate ventilation of the salient issues in dispute. We recognize the energy devoted by the district court to this litigation and the district court's superior knowledge of the minutiae involved. However, this knowledge does not eliminate the need for an appropriate factual determination where the disposition of Rockwell's motion necessarily turns upon the resolution of genuine issues of material fact. *Cf. United States v. City of Northlake*, 942 F.2d 1164, 1170 (7th Cir.1991). This does not mean that the district court was obligated to hold an evidentiary hearing. As we noted in *D. Patrick*, an evidentiary hearing is required only "to the extent necessary to resolve relevant factual disputes." 8 F.3d at 459. On the other hand, however, the court is obligated to resolve material issues of fact raised by the party seeking a finding of contempt. And in this case, an evidentiary hearing may be the appropriate mechanism for accomplishing this task.

We conclude that the district court's decision not to address these material factual

allegations deprived Rockwell of an opportunity to prove that contempt existed and therefore constituted an abuse of discretion. This matter must be remanded to the district court. On remand, the district court should engage the issues concerning Yamagata's and Tensor's conduct and determine whether either implicates the terms of the injunctions under the case law authority addressing the "active concert or participation" language of Rule 65(d).

### III

The district court properly cited the due process principles that protect parties whom others would have bound to the terms of an injunction. Our decision today recognizes that Rockwell is also entitled to the same due process protection. We are confident that the district court will bring its factfinding capability and knowledge of this case to bear in resolving the matter.

The district court's order denying Rockwell's "motion for rule to show cause why Tensor Group, Inc. and Toshio Yamagata should not be held in contempt of court and for appropriate sanctions" is VACATED, and this case is REMANDED for further proceedings consistent with this opinion.

ESCHBACH, Circuit Judge, concurring.

I agree with the court that we must vacate the district court's order denying Rockwell's motion for a rule to show cause and remand this matter for further proceedings. I write separately to note two errors of law made by the district court and to emphasize the factual findings that must be made upon remand. First, the court erred by holding that Tensor could not be "in privity" with DEV because Tensor acquired through a bankruptcy auction all of DEV's assets, except those covered by the injunctions. Second, the district court erred by holding that Yamagata could not be bound by the injunction because he was not personally enjoined and because DEV was no longer in existence.

### I.

The district court held that Tensor could not be "in privity" with DEV, and therefore could not be subject to the injunction, because it acquired DEV's assets through a bankruptcy auction. The district court stated that "[t]here is no privity between two companies when one purchases the assets of another through an independent third party." The district court focused on whether Tensor *legitimately* acquired any of the tainted assets. The district court stated that the analysis for a successor in interest is "inapposite here because Tensor did not purchase any of the assets that were at issue in the DEV litigation." The district court's reasoning ignores the allegations made by Rockwell. It is irrelevant that Tensor purchased *untainted* assets through an independent third party. Rockwell alleges that Tensor also acquired *tainted* assets that were the subject of the injunctions through other channels, unrelated to the bankruptcy auction. The fact that Tensor acquired some DEV assets through a bankruptcy auction does not extinguish privity where Tensor has acquired the tainted DEV assets through other channels. DEV cannot "launder" the tainted assets by their acquisition of untainted assets.

Tensor may be subject to the injunction under either of two scenarios. First, if Tensor acquired the enjoined property for the purposes of evading the judgment, Tensor may be subject to the injunction. *Walling v. Reuter,* 321 U.S. 671, 673–74, 64 S.Ct. 826, 827–28, 88 L.Ed. 1001 (1944); *Panther Pumps & Equipment v. Hydrocraft, Inc.,* 566 F.2d 8, 24–25 (7th Cir.1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). Second, if Tensor had knowledge of the court order and acquired the enjoined property through aiders and abettors who were subject to the injunction, then Tensor may be subject to the injunction. *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 13–14, 65 S.Ct. 478, 480–81, 89 L.Ed. 661 (1945); *Stotler & Co. v. Able,* 870 F.2d 1158, 1164 (7th Cir.1989).

### II.

The district court noted that a third party who is not a successor in interest may still be held in contempt of an injunction if the third party acts in concert with an enjoined party. The district court erred, however, in holding

922

that Tensor could not be an aider and abettor because "Yamagata was never personally enjoined" and because "DEV is no longer in existence."

First, an injunction against a corporation extends to the corporation's officers and employees. Fed.R.Civ.P. 65(d). We recently stated: "An order issued to a corporation is identical to an order issued to its officers, for incorporeal abstractions act through agents." *Reich v. Sea Sprite Boat Co., Inc.,* 50 F.3d 413, 417 (7th Cir.1995) (holding that the president of a corporation is bound by an injunction against the corporation itself). Yamagata is subject to the injunction because he was President and a director of DEV. We must reject Yamagata's argument that he could not act in his capacity as an agent of DEV because DEV was subject to the injunction. The logic of this argument is circular. Any action taken to violate the injunction would be a violation of the fiduciary duty and would be outside the scope of his agency. Yamagata cannot be protected from liability for committing a wrongful act by virtue of the fact that the act was wrongful.

Second, Yamagata finds no quarter in the fact that DEV is no longer in existence. An injunction enforceable by contempt proceedings against the corporation, its agents and officers "survives the dissolution of the corporate defendant." *Walling v. Reuter,* 321 U.S. at 674, 64 S.Ct. at 828 (holding that injunction survives dissolution of corporation and is enforceable against persons bound thereby including corporation's officers and agents).

Rockwell has alleged that Yamagata retained and used Rockwell trade secrets that he first acquired while he was an officer of DEV. Rockwell has also alleged that Yamagata ensured DEV's defiance of the injunctions by virtue of his failure to return Rockwell's trade secrets and his direct or indirect transfer of trade secrets to Tensor. Rockwell points out that such actions occurred even though Yamagata had an obligation as a DEV officer to insure that he and DEV complied with the terms of the injunctions. If Yamagata retained Rockwell trade secrets that he first acquired while he was an officer of DEV, then he may be subject to the injunction and Tensor may be subject to the injunction for acting in concert with an enjoined party.